**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JOSEPH V. WATERS,

                Plaintiff,

vs.                                    Case No. 3:18-cv-188-J-JRK

NANCY A. BERRYHILL,
Deputy Commissioner for Operations
of the Social Security Administration,
performing the duties and functions not
reserved to the Commissioner of
Social Security,

                Defendant.
_____/

## OPINION AND ORDER[1]

### I. Status

Joseph V. Waters ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying his claim for disability income benefits ("DIB"). Plaintiff's alleged inability to work is the result of severe seizures, schizophrenia, high blood pressure, and high cholesterol. See Transcript of Administrative Proceedings (Doc. No. 12; "Tr." or "administrative transcript"), filed April 2, 2018, at 87, 103, 228. Plaintiff filed an application for DIB on July 10, 2014,[2] alleging an onset disability date of April 27, 2014. Tr. at 191. The application was denied initially, Tr. at 87-100, 101, 102, 120-22, and upon reconsideration, Tr. at 103-17, 118, 119, 126-30.

---

      [1]      The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 11), filed April 2, 2018; Reference Order (Doc. No. 13), entered April 3, 2018.

      [2]      Although actually completed on July 10, 2014, see Tr. at 191, the protective filing date of the application is listed elsewhere in the administrative transcript as June 16, 2014, see, e.g., Tr. at 87, 103.

On November 22, 2016, an Administrative Law Judge ("ALJ") held a hearing, during which he heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 38-86. Plaintiff was forty-seven years old at the time of the hearing. Tr. at 44. The ALJ issued a Decision on February 14, 2017, finding Plaintiff not disabled through the date of the Decision. Tr. at 15-32.

The Appeals Council received additional evidence in the form of a brief authored by Plaintiff's counsel. Tr. at 4, 5; see Tr. at 183-87. On December 13, 2017, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner. On February 1, 2018, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff makes the following arguments: 1) "[t]he Commissioner erred in rejecting the opinions of Dr. [Diana] Benton and Dr. [Sherry] Risch, both of whom conducted detailed examinations with testing, regarding the severity of [Plaintiff's] mental impairments"; and 2) "[d]espite giving Dr. [John] Thibodeau's opinion significant weight, the Commissioner failed to explain why [ ]he was not accepting his opinion regarding [Plaintiff's] difficulties performing work with normal persistence and pace due to cognitive limitations." Plaintiff's Brief (Doc. No. 19; "Pl.'s Br."), filed July 5, 2018, at 1; see Pl.'s Br. at 11-19 (first argument), 19-21 (second argument). On November 2, 2018, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 24; "Def.'s Mem.") addressing Plaintiff's arguments. After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned finds that the Commissioner's final decision is due

to be reversed and remanded for further proceedings because the ALJ erred in considering Dr. Benton's opinions.

On remand, a proper evaluation of Dr. Benton's opinion may impact the ALJ's evaluation of Dr. Risch's and Dr. Thibodeau's respective opinions. For this reason, the Court need not address Plaintiff's arguments regarding Dr. Risch's and Dr. Thibodeau's respective opinions. See Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be reconsidered on remand); Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues).

## II. The ALJ's Decision

When determining whether an individual is disabled,[3] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four, and at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

---

[3] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Here, the ALJ followed the five-step sequential inquiry through step four, where the inquiry ended based on the ALJ's finding at that step. See Tr. at 17-32. At step one, the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since April 27, 2014, the alleged onset date." Tr. at 17 (emphasis and citation omitted). At step two, the ALJ found that Plaintiff "has the following severe impairments: a history of unspecified schizophrenia and a history of hypertension." Tr. at 17 (emphasis and citation omitted). At step three, the ALJ ascertained that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 18 (emphasis and citation omitted).

The ALJ determined that Plaintiff has the following residual functional capacity ("RFC"):

> [Plaintiff can] perform a range of medium work as defined in 20 [C.F.R. §] 404.1567(c). [Plaintiff] has the ability to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. [Plaintiff] can frequently push and/or pull arm/hand and foot/pedal controls. In an eight-hour workday, [Plaintiff] can sit for six hours, stand for six hours and walk for six hours. [Plaintiff] can frequently climb stairs and ramps, but never climb ropes, ladders or scaffolds. He can frequently balance, stoop, kneel, crouch and crawl. [Plaintiff] has no limitations regarding his ability to see, speak and hear. He has no limitations in the ability to use his upper extremities for reaching in all directions, handling, fingering and feeling. He can have no exposure to unprotected heights, dangerous moving machinery or open bodies of water. [Plaintiff] is limited to the performance of simple, rote and repetitive tasks, in a well-structured work environment where the job demands do not change from day to day. He can have occasional interaction with co-workers, supervisors and the general public. He is unable to do production-type work and would work better with things rather than other people.

Tr. at 19 (emphasis omitted). At step four, the ALJ relied on the testimony of the VE and found that Plaintiff is "capable of performing past relevant work as a Hospital Food Service Worker and as [a] Store Laborer." Tr. at 31 (emphasis omitted); see Tr. at 31-32. The ALJ did not make an alternative finding regarding the fifth step. The ALJ concluded that Plaintiff

"has not been under a disability . . . from April 27, 2014, through the date of th[e D]ecision." Tr. at 32 (emphasis and citation omitted).

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. § 405(g). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence.'" Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (citation omitted). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence—even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

### IV. Discussion

The undersigned addresses Plaintiff's argument regarding the ALJ's evaluation of Dr. Benton's opinions. As noted above, the remaining arguments are not addressed. By way of background, Dr. Benton is a licensed psychologist, who conducted a psychological evaluation

-5-

of Plaintiff at the request of the Florida Department of Health, Division of Disability Determinations. See Tr. at 432-435.

**A. Parties' Arguments**

Plaintiff contends the ALJ erred in relying primarily on the progress notes from Meridian Behavioral Healthcare ("Meridian"), authored by Thomas Yanick, ARNP, in discounting Dr. Benton's opinions. See Pl.'s Br. at 15-19. Plaintiff argues that "the Meridian notes during this time period do not contain any indication of memory testing or any detailed examination." Id. at 16. Plaintiff asserts that "[h]e was being seen [at Meridian] for 15 minutes or less every three months for medication management." Id. (citation omitted). According to Plaintiff, "the Meridian records are very nonspecific and themselves contain internal inconsistencies, likely due to the computerized nature of the system of record keeping." Id. Plaintiff contends that Mr. Yanick was not considered an acceptable medical source at the time of the Decision. Id. at 17.[4] Thus, argues Plaintiff, "[t]he ALJ essentially relied on the findings in vague and internally inconsistent progress notes from a nonacceptable medical source for the purpose of discounting the detailed medical opinions from [Dr. Benton.]" Id.

Responding, Defendant asserts that "[t]he ALJ specifically noted that Plaintiff's medical records from Meridian . . . demonstrated that he did not complain about medication side effects and was doing well on Geodon as late as April of 2014." Def.'s Mem. at 7 (citation omitted). Defendant contends that "[t]he ALJ further noted there were numerous inconsistencies in Plaintiff's statements to Dr. Benton compared to his statements to Mr.

---

[4] On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (January 18, 2017). Under the new regulations, advanced registered nurse practitioners are considered acceptable medical sources. See id. at 5863; 20 C.F.R. § 404.1502(a)(8). Because Plaintiff filed his claim before March 27, 2017, however, the new regulations do not apply in Plaintiff's case.

Yanick at Meridian." Id. (citation omitted). According to Defendant, "Plaintiff's mental status exams from Meridian were largely unremarkable and Plaintiff reported his medications were working well to control his symptoms." Id. (citation omitted).

**B. Applicable Law**

The Regulations[5] establish a "hierarchy" among medical opinions[6] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5) (2006)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

---

[5] As noted, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions, 82 Fed. Reg. 5844-01, 5844. Because Plaintiff filed his claim before that date, the undersigned cites the rules and Regulations applicable to Plaintiff's claim, unless otherwise noted.

[6] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a 's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1502 (defining "[a]cceptable medical sources"); 20 C.F.R. § 404.1513(a).

With regard to a treating physician or psychologist[7] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c)(2). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's or psychologists's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's or psychologists's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician or psychologist should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1305 (11th Cir. 2018) (citation omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's or psychologists's own medical records. Hargress, 883 F.3d at 1305 (citation omitted); Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d

---

[7] A treating physician or psychologist is a physician or psychologist who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)). However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(c), 416.927(d) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

**C. Dr. Benton's Opinions/ALJ's Decision/Analysis**

Dr. Benton conducted a psychological evaluation of Plaintiff on September 9, 2014. See Tr. at 432-35. During the evaluation, Plaintiff and his wife reported the following. Before

Plaintiff began taking psychotropic medication, he used to think "people were out to get him," and he would hear "people talking" and "saying something about sports or something." Tr. at 432. According to Plaintiff's wife, Plaintiff "used to hear things, like the same thing over and over, like music, like repeating the same thing." Tr. at 432. Plaintiff does not think he can work because his legs are weak. Tr. at 433. Plaintiff stated, "When I get up and walk it's like I'm going to fall." Tr. at 433. This weakness started in early August 2014, and "[t]hey" (apparently his doctors) say it is "probably" a side effect of his medication. Tr. at 433. Plaintiff further reported that he has taken psychotropic medication "intermittently" since the 1980's and is currently being treated with Clozaril, which "is helpful but makes him drowsy." Tr. at 433. He also takes Depakote for seizures. Tr. at 433. Plaintiff described his mood as "a boring mood" and his wife stated, "Confusion more, hard to focus and concentrate." Tr. at 434.

With regard to activities of daily living, Plaintiff is able to bathe, dress, and eat. Tr. at 433. He stated he can stand for about ten or fifteen minutes and walk for about an hour. Tr. at 433. He can cook "a little bit, something simple like hot dogs." Tr. at 433. He does not go grocery shopping because he has "trouble reading grocery products." Tr. at 433. He is unable to drive due to seizures, and he is unable to manage finances. Tr. at 433. He stated, "Mostly I do a crossword puzzle or something. Then I listen to music. Sweep or mop." Tr. at 433. According to his wife, he does not sweep or mop every day, "he mostly sleep[s]." Tr. at 433-34. Plaintiff talks with a friend two or three times a week. Tr. at 434. He talks to his brother and sister once or twice a week on the telephone, and he sees them "maybe once or twice a month." Tr. at 434. Plaintiff goes to church "about twice a month." Tr. at 434.

Dr. Benton made the following mental status findings and observations. She noted Plaintiff "appeared to walk carefully." Tr. at 434. Plaintiff "did not appear to fully extend his legs as he walked; rather, he appeared to keep his knees bent." Tr. at 434. According to Dr. Benton, Plaintiff "sometimes shuffled his feet as he walked." Tr. at 434. Plaintiff's "mouth was open throughout almost the entire interview." Tr. at 434. Dr. Benton noted that there appeared to be a tremor in Plaintiff's hands, and Plaintiff said the shaking was intermittent. Tr. at 434. Plaintiff's articulation was "poor." Tr. at 434. Plaintiff's thought processes were "[l]ogical and goal oriented," but they "appeared slowed." Tr. at 434. Plaintiff "appeared to be sedated with congruent affect." Tr. at 434. He was able to repeat six out of six digits forward and four digits backward, he was able to spell "world" backward, and he was able to recall one of three objects after five minutes. Tr. at 435. Plaintiff was unable to perform "serial sevens subtraction," but he was able to perform mental addition of double digit numbers and simple multiplication. Tr. at 435. He was unable to "interpret two common sayings." Tr. at 435. Plaintiff was "unable to recite the alphabet, which he attributed to medication side effects." Tr. at 435.

Dr. Benton diagnosed Plaintiff with "[s]chizophrenia, [p]aranoid type." Tr. at 435. She opined that Plaintiff "does not currently appear capable of working." Tr. at 435. She explained, "Specifically, he appears sedated and would have difficulty sustaining concentration, persistence, and social interaction over a 40-hour work week." Tr. at 435.

The ALJ gave Dr. Benton's "findings and opinion" "some partial weight." Tr. at 26. The ALJ stated that "they are somewhat inconsistent with the progress notes from Meridian . . . as well as the observations offered by his primary care provider and his treating neurologist." Tr. at 26. The ALJ explained as follows:

> Meridian records show that [Plaintiff] did not complain about medication side effects and was doing well on Geodon as late as April of 2014. [Plaintiff] specifically requested that he be taken off Clozaril due to some weight gain. There are numerous inconsistencies in [Plaintiff's] statements offered to Dr. Benton as compared to what he related to Mr. Yanick at the Meridian facility. Mental status exams from Meridian were largely unremarkable and [Plaintiff] reported his medications were working well to control his symptoms, which is inconsistent with what he related to Dr. Benton.

Tr. at 26 (citation omitted).

The ALJ erred in his evaluation of Dr. Benton's opinions because the reasons he provided for partly discounting the psychologist's opinions are not supported by substantial evidence. As noted, the ALJ stated that records from Meridian show Plaintiff did not complain about medication side effects, but a review of the medical evidence paints a different picture. Plaintiff has had a long history of side effects—some serious—from his medications. See Tr. at 316-17 (February 7, 2013 treatment note indicating dosage of Clozaril was decreased due to sedation side effects); Tr. at 314-15 (March 21, 2013 treatment note indicating dosage of Clozaril was increased after Plaintiff reported that his wife noticed "problems [with his] behavior"); Tr. at 307-08 (December 10, 2013 treatment note indicating Plaintiff's medication was changed from Clozaril to Fanapt due to weight gain and hypersalivation); Tr. at 481-83 (June 19, 2014 treatment note indicating that Plaintiff "restarted" Clozaril because he was hospitalized for a "serious cardiac illness after switch from [C]lozaril to Geodon" and that he developed a new seizure disorder while hospitalized); Tr. at 509-11 (August 18, 2016 treatment note indicating Clozaril caused weight gain and hypersalivation, "which were reasons for wanting to stop [C]lozaril" in the past). Indeed, in summarizing the medical evidence, the ALJ focused on the instances when Plaintiff reported no side effects. Tr. at 24 (ALJ stating that on August 22, 2014, Plaintiff "denied any side effects relating to Keppra"); Tr. at 30 (ALJ stating that Plaintiff "may have experienced some adverse medication side

-12-

effects related to some of the earlier medications prescribed for this condition" (emphasis added)). Again, this is a mischaracterization of the record. See, e.g., Tr. at 437 (July 22, 2014 treatment note indicating that Plaintiff "reportedly has been sleepy and drowsy since being on the [K]eppra"); Tr. at 588 (September 22, 2016 treatment note indicating that Plaintiff "is interested in going off [K]eppra, he feels weak and drowsy" and "feels foods taste strange").

The ALJ's reliance on the fact that Plaintiff "was doing well on Geodon as late as April of 2014," Tr. at 26, is confusing. While it is true that on April 1, 2014, the "taper to Geodon" was going "well so far," Plaintiff had not "completed [the] taper yet." Tr. at 301-02. Importantly, in June 2014 Plaintiff developed a "serious cardiac illness after switch from [C]lozaril to Geodon," and he had to stop taking Geodon. Tr. at 481. Further, Plaintiff was hospitalized a number of times apparently as a result of side effects from medications, including Geodon; notably, he was in the intensive care unit for "several days," and one of the hospitalizations lasted about twenty days. See Tr. at 544-46 (May 1, 2014 Lake City Medical Center Emergency Room ("Lake City ER") records indicating Plaintiff presented with disorientation, confusion, decreased responsiveness, and in an "altered mental status"; noting that Plaintiff had "changed psych medication 7 days ago"); Tr. at 536 (May 2, 2014 Lake City ER record showing Plaintiff presented with a fever, a change in mental status, agitation, and confusion; indicating Plaintiff's "medicines [were] change[d] last week," "his schizophrenia [was] worse," Plaintiff was given Geodon—"his prior medicine"—and "awoke yelling out"); Tr. at 385-89 (North Florida Regional Medical Center ("North Florida RMC") records indicating Plaintiff was transferred from Lake City ER to North Florida RMC on May 2, 2014 and discharged on May 5, 2014; Plaintiff presented with a fever and tachycardia, was agitated and confused, was "really not communicating," developed "involuntary jerking

movements" that were possibly a "medication[-]related side effect," and was "Baker acted"; and discharging Plaintiff to psychiatric facility); Tr. at 380 (North Florida RMC record indicating Plaintiff was admitted again on May 6, 2014 for chest pain but ultimately finding Plaintiff was "medically stable for transfer back to the psych[iatric] facility"); Tr. at 367-68 (North Florida RMC records indicating Plaintiff was admitted on May 9, 2014 and discharged on May 28, 2014 primarily for possible "seizure-like activity" that began while he was in the psychiatric facility; noting that electroencephalogram ("EEG") test results were "abnormal" and showed a "diffuse cerebral dysfunction" and an "epileptogenic focus in the left mid temporoparietal region with propagation to the occipital region also on the left"; indicating Plaintiff was intubated and transferred to the intensive care unit, where he remained for "several days"; and describing Plaintiff's hospital stay as "lengthy" and "complicated"). Thus, the relevance of the fact that Plaintiff was "doing well" on Geodon in April 2014 is unclear.

As noted, the ALJ stated that Plaintiff made "numerous" statements to Dr. Benton that are inconsistent with the statements he made to Mr. Yanick at Meridian. Tr. at 26. Specifically, the ALJ found that Plaintiff's reports to Mr. Yanick that his "medications were working well to control his symptoms" was inconsistent with the statements he made to Dr. Benton. Tr. at 26. Substantial evidence does not support this finding. Plaintiff told Dr. Benton that his medication "is helpful but makes him drowsy." Tr. at 433. Similarly, a Meridian treatment note from June 19, 2014 states, "Feels pretty good, drowsy." Tr. at 481. Plaintiff did not represent to Dr. Benton that his medications were not helping; on the contrary, he stated they were helpful but made him drowsy. This is exactly what he reported to Mr. Yanick. Further, to the extent the ALJ was referring to Plaintiff's statement to Dr. Benton that he experiences weakness in his legs, probably due to his medications, this statement is not

inconsistent with the medical evidence. See Tr. at 424, 437, 440, 443, 446, 554, 560 (records from Plaintiff's treating neurologist, Dr. Prasad Nidadavolu, indicating Plaintiff has "[w]eakness in both legs and feet").[8]

The ALJ did not identify any of the other "numerous" inconsistencies among Plaintiff's statements to Dr. Benton, Mr. Yanick, and treating physicians. To the extent there are other inconsistencies, the ALJ identified none, and it would be improper for the Court to draw its own conclusions and decipher whatever inconsistencies the ALJ may have perceived in Plaintiff's statements; especially in light of his inaccurate finding that Plaintiff made inconsistent statements about the effectiveness of his medications. See Rosario v. Comm'r of Soc. Sec., 877 F. Supp. 2d 1254, 1266 (M.D. Fla. 2012) (recognizing that "conclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion" and that "it would

---

[8] It appears the ALJ did not consider the medical records from Plaintiff's treating neurologist that specifically indicate that Plaintiff experiences leg weakness, as there is no discussion of them in the Decision. Further, and perhaps most troubling, is the following exchange at the hearing during which the ALJ interrupted Plaintiff while he was trying to explain that the weakness in his legs prevents him from doing household chores:

[ALJ:] Is there something physically keeping you from doing household chores?

[Plaintiff:] Yeah, because the medicine I take keeps my legs weak and stuff when I try to walk and stuff and –

[ALJ:] <u>Well, I don't see anything in the record that suggests that</u>.

[Plaintiff:] That's from the side effects of the medicine.

[ALJ:] Have you told any doctors about these side effects?

[Plaintiff:] I told the neurologist, I believe. Neurologist.

Tr. at 71 (emphasis added).

be improper for the [c]ourt to draw its own conclusions from the ALJ's summary of the medical evidence"); see also Gayler v. Astrue, No. 5:07-cv-121-Oc-GRJ, 2008 WL 4327050, at *6 (M.D. Fla. Sept. 18, 2008) (unpublished) (reversing and remanding ALJ's decision to discount a treating physician's opinion when "the ALJ failed to explain or even provide a clue as to how [the treating physician's] opinion was inconsistent with other record medical evidence"); Russ v. Astrue, No. 3:07-cv-1213-J-MCR, 2009 WL 764516, at *10 (M.D. Fla. Mar. 20, 2009) (unpublished) (finding an ALJ's "dismissal" of a treating physician's opinion was "deficient" when the ALJ noted the opinion "was 'not supported by objective findings,'" but did not provide any explanation for the reason) (quoting ALJ's decision)).

In sum, although inconsistency with other evidence may be a ground for discounting a medical opinion, here, the "inconsistencies" found by the ALJ are not supported by substantial evidence and are to an extent based on mischaracterizations of the record. The ALJ's blanket statement that Plaintiff did not complain about medication side effects is not supported by substantial evidence and is directly contradicted by the evidence of record. The ALJ's reliance on the fact that Plaintiff was "doing well" on Geodon in April 2014 is confusing and does not provide substantial evidence to uphold the ALJ's rejection Dr. Benton's opinions. As to the "numerous" inconsistencies in Plaintiff's statements that the ALJ refers to, the ALJ only identifies one, which is not actually an inconsistency.

Moreover, although the ALJ gave "partial weight" to Dr. Benton's opinions, he did not clarify what parts of the opinions he accepted and rejected. On remand, if the ALJ decides to give partial weight to Dr. Benton's opinions, he should identify the opinions he is accepting and the ones he is rejecting.

### V. Conclusion

For the foregoing reasons, it is

-16-

**ORDERED**:

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

    (A) Reconsider the opinions of Dr. Diana Benton, assign the appropriate weight to such opinions, and explain the reasoning behind the weight assigned;

    (B) If appropriate, reconsider the opinions of Dr. Sherry Risch;

    (C) If appropriate, reconsider the Dr. John Thibodeau's opinion regarding Plaintiff's difficulties performing work with normal persistence and pace due to cognitive limitations; and

    (D) Take such other action as may be necessary to resolve this claim properly.

2. The Clerk is further directed to close the file.

3. In the event benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on March 28, 2019.

*James R. Klindt*
JAMES R. KLINDT
United States Magistrate Judge

bhc
Copies to:
Counsel of record